UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -                        13-CR-615 (JG)

MICHAEL SLATTERY, JR.,

        Defendant.

– – – – – – – – – – – – – – X

### GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with the sentencing of the defendant Michael Slattery, Jr., which is scheduled for January 10, 2014, and in response to the defendant's sentencing memorandum, submitted on December 20, 2013 ("Def. Mem."). For the reasons stated below, given the nature and circumstances of the defendant's crimes and the great need in this case to promote respect for the law and ensure just punishment, the government respectfully submits that a sentence within the Guidelines range of 24 to 30 months' imprisonment is appropriate.

### I. BACKGROUND

**A.    Rhinoceros Trafficking**

On July 1, 2013, the President issued an Executive Order entitled "Combating Wildlife Trafficking." Section 1 of the President's Executive Order states:

> The poaching of protected species and the illegal trade in wildlife and their derivative parts and products (together known as "wildlife trafficking") represent an international crisis that continues to escalate. Poaching operations have expanded beyond small-scale, opportunistic actions to coordinated slaughter commissioned by armed and organized criminal syndicates. The survival of protected wildlife species such as elephants, rhinos,

1

> great apes, tigers, sharks, tuna, and turtles has beneficial economic, social, and environmental impacts that are important to all nations. Wildlife trafficking reduces those benefits while generating billions of dollars in illicit revenues each year, contributing to the illegal economy, fueling instability, and undermining security. Also, the prevention of trafficking of live animals helps us control the spread of emerging infectious diseases. For these reasons, it is in the national interest of the United States to combat wildlife trafficking.

See http://www.whitehouse.gov/the-press-office/2013/07/01/executive-order-combating-wildlifetrafficking (last viewed Nov. 26, 2013). Trafficking in rhinoceros horn is lucrative because the numbers of rhinoceros are limited while market demand is growing. The black market – fueled by both newly poached and older horn – is driving the current decimation of rhinoceros populations. See http://www.whitehouse.gov/the-press-office/2013/07/01/fact-sheetus-efforts-combat-wildlife-trafficking (last viewed Nov. 26, 2013), Fact Sheet: U.S. Efforts to Combat Wildlife Trafficking ("Wildlife trafficking is a multi-billion dollar illicit business that is decimating Africa's iconic animal populations. Many species – most notably elephants and rhinoceroses – now face the risk of significant decline or even extinction.") "In 2012, a record 668 rhinos were poached in South Africa, up by almost 50 percent on 2011's figures. In 2013, the toll continued to rise, with 201 rhinos killed in Kruger National Park alone." See Criminal Nature – The Global Security Implications of the Illegal Wildlife Trade, International Fund for Animal Welfare (June 2013), Page 7, attached as Exhibit A.

Trade in rhinoceros horn has been regulated since 1976 under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), a treaty signed by over 170 countries around the world to protect fish, wildlife, and plants that are or may become imperiled due to the demands of international markets. Nevertheless, the demand for rhinoceros horn and the black market prices for it have skyrocketed in recent years due to the value which some cultures have placed on ornamental carvings, good luck charms or alleged medicinal purposes, leading to a decimation of the global rhinoceros population. (PSR ¶¶4-5). See also Exhibits A and B (a collection of articles, from the New York Times, Time Magazine, and Africa Geographic, as well as data compiled by the Ministry of the Environment in South Africa and Traffic, a non-profit wildlife trade monitoring network). The CITES Secretariat considers the illegal trade in rhinoceros horn as one of the most serious criminal activities currently faced by CITES. The "illegal trade shows signs of organised criminal groups, money laundering, corruption of officials and sophisticated smuggling across international borders." See Impact Report: ILLEGAL AND LEGAL TRADE PRICES FOR RHINO HORN, Statement from Mr. Thomas I. Milliken, Elephant and Rhino, Programme Leader, TRAFFIC International, 03 November 2013, attached as Exhibit C.

In the United States, CITES is implemented through the Endangered Species Act ("ESA"). The ESA makes it a crime to knowingly sell and offer to sell endangered species of fish and wildlife in interstate and foreign commerce, as set forth in Title 16, United States Code, Sections 1538(a)(1)(F) and 1540(b)(1). Under the ESA, the term "endangered species, includes "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The black rhinoceros was listed as an endangered species as of July 1980.

Thus, under the ESA it is unlawful to knowingly and without authorization to sell or offer to sell in interstate or foreign commerce horn from black rhinoceros.

A significant proportion of the black rhinoceros trade is illegal. An estimated minimum of 1,500 rhinoceros horns entered illegal international trade from Africa to Asia from 2006-09.[1] This increased demand has also led to increased sourcing of rhinoceros horns in private ownership, typically as antique specimens[1] and as hunting trophies acquired before CITES came into effect in 1975. These horns generally enter international trade for destinations in consuming countries in East Asia. Significantly, this increased sourcing of horns has coincided with a rise in rampant poaching in South Africa, which has led to the rapid depletion of the species and, therefore, an increase in the value of rhinoceros horn. The increase in value of these horns has resulted in the trafficking of both raw and carved horns. According to both Interpol and Europol, trade in rhinoceros horn has become so lucrative that organized crime groups are involved at various levels from poaching, to trafficking, to even robbing museums and private dealers. While increased law enforcement and conservation efforts have decreased the slaughter somewhat, continued efforts are needed to keep rhinoceros, and, in particular, the black rhinoceros, from becoming extinct.

In 2011, the Department of the Interior's Fish and Wildlife Service ("FWS") and the Department of Justice initiated "Operation Crash,"[2] in order to detect, deter and prosecute those engaged in the illegal killing of rhinoceros and the unlawful trafficking of rhinoceros horns. (Presentence Investigation Report ("PSR ¶3")). The investigation into the defendant and his co-conspirators is one of many such investigations being handled by a nationwide task force of agents focused on rhinoceros trafficking. Id.

---

[1] See http://www.cites.org/eng/cop/15/doc/E15-45-01.pdf (last visited on Dec. 29, 2013).

[2] A "crash" is a term for a herd of rhinoceros.

4

Recent prosecutions in the Southern District of New York (United States v. Wang, 13 Cr. 452 (KBF)) and in the District of New Jersey (United States v. Zhifei Li, Crim. Nos. 13-113 and 13-552), along with this investigation, have further highlighted the role of the wholesale level trade in the market for rhinoceros horns, which often terminates in China. Raw horns and older raw horns in particular – such as those purchased and sold by the defendant in this case – are highly sought after in China. The defendant's role in the trafficking network was to ferret out the rhinoceros horns in the United States and to quickly sell the horns to conduits with contacts in China. As the horns are moved from one level in the trade chain to the next, the value of the horns escalates significantly. For example, the horns the defendant and his co-conspirators purchased in Texas for $28,000 were quickly sold by them to a foreign national in New York for $50,000 and then twice again to other foreign nationals (also in New York) for $80,000 and then $108,000. As evidenced by the transaction at issue, even the smuggler's price escalates significantly from one smuggler to the next, prior to the horns ever making it to China. The escalating value of these items has resulted in an increased demand for rhinoceros horn and has helped to foster a thriving black market. As a result, the defendant's criminal conduct has helped to sustain this market and the slaughter of rhinos to supply it.

B.     **The Defendant's Wildlife Trafficking**

    **1.  Underlying Charge of Conviction**

On September 20, 2010, the defendant, along with his brother John Slattery, and Patrick Sheridan, traveled from London, England to Houston, Texas. (PSR ¶ 9.) While in Texas, the defendant deposited approximately $5,400 into a previously opened Bank of America account in Austin. Within a few days of the purchase, the defendant received a wire transfer of approximately $8,000 from a foreign bank account into the Bank of America account.

5

After moving money into his account in a U.S. bank, the defendant and his co-conspirators attempted to purchase a taxidermied black rhinoceros head mount with two horns from an auction house in Austin, Texas. (PSR ¶ 9.) The auction house refused to sell the mount to the defendant and his co-conspirators because they did not have proof that they resided in the State of Texas. Id. Under the Endangered Species Act, an intrastate sale of endangered species is not illegal. Interstate sales, however, are illegal.

On September 22, 2010, the defendant and his co-defendants hired a day laborer to act as a "straw buyer" in order to purchase the mount. (PSR ¶ 10.) On September 23, the defendant, along with the straw buyer and his two co-defendants, returned to the auction house. Id. Prior to entering the auction house, the defendant instructed the straw buyer to say that the mount was for him [the straw buyer] and the defendant handed the straw buyer an envelope with $18,000 cash to pay for the mount. Id.

Upon purchasing the mount, the manager of the auction house asked the straw buyer to complete an affidavit, which was incorporated into the Bill of Sale, described below. After the affidavit was completed, the defendant and his co-conspirators directed the manager to remove the horns from the mount. After the horns were removed, the group left the auction house with the horns, but not the head of the rhinoceros. Along with the horns, the auction house provided the group with an "Endangered Species Bill of Sale," dated September 23, 2010, which stated that the straw buyer was "the purchaser" of a "Black Rhino Shoulder Mount." The document, signed by the straw buyer, also stated:

> Seller expressly states that the described taxidermy is an endangered species and that interstate or foreign sales, barter and trade are strictly prohibited . . . pursuant to [the Endangered Species Act]. Buyer has expressly stated that he/she is a current resident of the State of Texas and has no intention of participating in any form of interstate commerce involving the described taxidermy.

(PSR ¶ 10.)

In October 2010, the defendant left the United States, only to return in November so that he could sell the horns. On or about November 14, 2010, the defendant and his brother John Slattery visited the home of an Asian art collector in New York City. While at the collector's home, the defendant was introduced to a Chinese National residing in New York. The defendant and his brother offered to sell four black rhinoceros horns to the Chinese National for a price of $65,000. After sending the potential buyer pictures of the horns via email, the defendant and his brother agreed to meet their buyer a couple of days later at the New York City home of the collector.

At that meeting, on November 16, 2010, the defendant and his brother agreed to sell four black rhinoceros horns to the buyer for $50,000. (PSR ¶ 12.) They told the buyer that they were returning to Europe the following day and would accept cash or bank check for the horns. Immediately after that meeting, the defendant and his brother met the buyer at a bank in Queens, New York. They accompanied the buyer into the bank and, once inside, handed him a piece of paper that stated they would accept three bank checks made out as follows: John Slattery for $12,500; Michael Slattery, Jr. for $12,500; and Patrick Sheridan for $25,000. Thereafter, the defendant, his brother and the buyer met at a restaurant near the bank to make the exchange. At the restaurant, the buyer provided the defendant and his brother with the checks, totaling $50,000, and the defendant and his brother gave the buyer the four black rhinoceros horns and a

7

document titled "Endangered Species Bill of Sale." (PSR ¶ 12.) The document indicated that the four horns, which were described on the document as "2 pairs of Black Rhino," were purchased at the Texas auction house on August 14, 2010, by the straw buyer. The document also included the restrictive language quoted above, supra at 6.[3] On the following day, the defendant, his brother and Sheridan departed the United States.

### 2. The Defendant's Other Rhinoceros Horn Transactions

At some point in 2010, likely between May and June, but certainly prior to November 2010, the defendant traveled to Joshua, Texas. (PSR ¶ 7.) While in Texas, he purchased a black rhinoceros mount bearing two horns from a taxidermist for $10,000. Id.

On January 4, 2011, the defendant sent an email to a potential buyer in New York that stated he would be in the United States later that month and would have 10 rhinoceros horns for sale. (PSR ¶ 17). A photograph depicting 10 rhinoceros horns was attached to the email. Several of the horns depicted in the photographs appeared to be white rhinoceros, which at the time were not protected under the ESA, but at least two appear to be black rhinoceros. These horns were sold to a buyer in the United States for $260,000, of which the defendant received $60,000.

### C. Procedural History and Guidelines Calculation

On September 14, 2013, the defendant was charged by Complaint with a Lacey Act false records violation, Title 16, United States Code, Sections 3372(d)(2) and 3373(d)(3)(A) and Title 18, United States Code, Section 2. On November 5, 2013, pursuant to a plea agreement, the defendant waived indictment and pled guilty to a single-count Information, which

---

[3] The government has a copy of the document and it appears to be an altered copy of the Endangered Species Bill of Sale dated September 23, 2010 for two horns. Importantly, the "Endangered Species Bill of Sale" that defendant and his co-conspirators provided to the purchaser included a fraudulent U.S. Fish & Wildlife Service emblem on it, which was not on the document when the two horns were purchased in Texas. (PSR ¶ 12.)

8

charged him with conspiracy to commit wildlife trafficking, in violation of Title 18, United States Code, Section 371. (PSR ¶ 1.)

The Probation Department has correctly calculated the defendant's adjusted Offense Level of 17 and a Criminal History Category of I. (PSR ¶ 61.) This results in a Guidelines range of 24 to 30 months' imprisonment and a fine range of $5,000 to $50,000, which is consistent with the government's calculation in the plea agreement. (PSR ¶¶ 61 and 68.) There are no factors that warrant a departure from a sentence within the Guidelines range, and no factors that warrant a sentence outside of the advisory Guidelines range. (PSR ¶¶ 71-72.) The defendant has the ability to pay a fine within the Guidelines' fine range. (PSR ¶ 59.)

## II. DISCUSSION

For the reasons set forth below, the government submits that a sentence within the Guidelines range of 24 to 30 months is reasonable. The government also respectfully requests that the Court impose a fine on the defendant, and that the fine be directed towards the Lacey Act Reward Fund pursuant to 16 U.S.C. § 3375(d) and 42 U.S.C. § 10601(b)(1)(A)(ii).

### A. Legal Standard

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S.Ct. 586, 596 (2007). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 596-97 (citation and footnote omitted). To the extent a District Court imposes a sentence outside the range

recommended by the Guidelines, the Court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. at 596.

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; the need for the sentence to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. See 18 U.S.C. § 3553. The court must also consider the kinds of sentences available, the applicable Sentencing Guidelines and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. Id.

B. Calculating the Guidelines Range

In this case, the Guidelines calculation is governed by U.S.S.G. § 2Q2.1(a) for the base offense level of 6; and U.S.S.G. § 2Q2.1(b)(1)(A) for an enhancement of 2 points, based on the fact that the offense was committed for pecuniary gain and involved a commercial purpose. Similarly, the Guidelines apply a specific offense characteristic for market value, U.S.S.G. §§ 2Q2.1(b)(3)(A)(ii), 2B1.1(b)(1). The defendant appears to contend that the "rigid use of the Fraud Loss table" in U.S.S.G. § 2B1.1 is "ill-suited" here, although he does not appear to suggest an alternative method for calculating the Guidelines. See Def. Mem. at 13. Furthermore, the defendant argues that the Guidelines estimate in the PSR is inapplicable here because it takes into account the market value of the horns sold in China as opposed to the dealer value between the defendant and the buyer. See Def. Mem. at 5-14. The government respectfully disagrees and

argues that the Guidelines range estimated in the PSR, in accordance with U.S.S.G. § 2B1.1(b)(1)(G), is applicable in this case. The PSR correctly, albeit conservatively, estimates the market value of the rhinoceros horns in this case at $224,325, with the corresponding 12 level increase in offense level. (PSR ¶ 25.)

  C. Market Value

The Sentencing Guidelines specifically use the term "market value" and application note 4 provides guidance that "'market value' under subsection (b)(3)(A) shall be based on the **fair-market retail price**." (emphasis added). See 2Q2.1(b)(3) cmt. 4; United States v. Koczuk, 252 F.3d 91, 96-97 (2d Cir. 2001). Application note 4 also states that where fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information." Case law interpreting 2Q2.1(b)(3) has made clear that the "smuggler's price" or "crook's price" is not the relevant standard. See, e.g., United States v. Eyoum, 84 F.3d 1004, 1007 (7th Cir. 1996) (rejecting defendant's assertion that "market value" should be calculated using the price agreed upon by defendant and a willing buyer as "squarely against the meaning of 'market value' under § 2Q2.1(b)(3)(A)"); United States v. Dove, 247 F.3d 152, 159 (4th Cir. 2001) (rejecting defendant's contention that market value should be calculated using the price defendant received for bear gallbladders, which was in West Virginia, where such sales are legal; holding that district court's calculation of market value using highest price for which it had reliable evidence was correct, recognizing that "the price paid by the ultimate consumers was higher than what defendant received").

As discussed herein, the retail market for raw rhinoceros horns is in Asia, specifically China and Vietnam. See, e.g., Exhibits A, B, and C. The defendant, in his sentencing submission, suggests that the applicable market value for the rhinoceros horns was

the amount he and his co-conspirators paid when they illegally purchased the horns while in Texas. Courts have unequivocally rejected this approach. See Eyoum and Dove, supra. The defendant's own actions in this case belie his claim, in that he was well aware that the final destination for the horns was the marketplace in China. Shortly after making the illegal purchase of the black rhinoceros horns in Texas for $28,000, the defendant and his co-conspirators turned to their contacts in New York and sold the horns to a Chinese national for a large profit. In fact, even before the horns were smuggled to China, the defendant's New York client immediately resold the same horns for a significant profit. The four horns were resold for $80,000 and then resold again in the United States to a Chinese national for $108,000. Merely because the defendant's actions occurred at the lowest levels of commerce does not mean that the price he paid was the retail market price; quite the contrary.

The cases on which the defendant relies are misleading. In fact, these cases stand for the exact opposite of what defendant would like them to represent. In the case the defendant refers to as the "Denver, CO undercover sting" case, captioned United States v. John Sullivan, *et al.*, 10-cr-00588-WYD (D. Colo. 2011), the parties agreed that the market value of the horns was actually between $30,000 and $70,000, not the $17,600 paid for the horns.[4] The horns in Sullivan were of poor quality with numerous boring holes that not only reduced the weight of the horns, but called into question whether the horns could even be resold. As part of that case, the government submitted to the Court an April 2011 letter from TRAFFIC North America, which detailed the illegal trade in rhinoceros horns, which, as of 2011, was fueled by prices in Asia of up to $20,000 per pound. For the Court's reference in this case and as further evidence of the

---

[4] This is reflected in a plea agreement between the parties, which is not available electronically. It is worth noting that even the $30,000-$70,000 market value was conservative due to the fact that the horns were of poor quality with numerous boring holes that not only reduced the weight of the horns, but called into question whether the horns could even be resold.

fair market value for rhinoceros horns, this letter is attached hereto as Exhibit D. Similarly, the defendant incorrectly relies on U.S. v. Hausman, 12-CR-576 (JPO) (SDNY) as support for his unique definition of market value. Defendant cites to the price Hausman paid for his illegal purchases of rhinoceros horns (some of which were purchased while Hausman was working with the Government). In fact, the market value that dictated Hausman's Guidelines calculation was at least $120,000; and while the Court granted a variance from the stipulated Guidelines range of 18-24 months, the variance was based on the age and poor health of the defendant. Likewise, defendant's reliance on U.S. v. Wang, 13 cr. 452 (KBF) is misplaced. Unlike the defendant here, the defendant in Wang dealt in high-end rhinoceros horn carvings, which he smuggled out of the United States to China. The agreed-upon market value of the items purchased by Wang recognized that the fair market value for the high-end carvings was not based on weight of the horns and was not substantially more than the amount Wang paid for the carvings.

In this case, the defendant sold the horns to a Chinese National in New York for $50,000. There is no legal support to justify using the price the defendant received for the horns as the fair market value price. The defendant and his co-conspirators were simply lower in the supply chain, and, therefore, they received a lower price than the horns commanded in the marketplace. The horns were then sold twice more while still in the United States, the last sale for $108,000. Following that sale, upon information and belief, the horns were smuggled out of the United States. Based on reports of the price paid for raw rhinoceros horn in China, it is reasonable to believe that the horns were sold in the Chinese market for $45,000 to $65,000 per kilogram. See, e.g., Exhibits A – D. In light of the fact that the four horns weighed a total of almost five kilograms, the fair market value for the horns totaled more than $200,000. Based on Guidelines Section 2B1.1(b)(1)(G), the applicable offense level should be increased by 12.

13

D. <u>A Guidelines Sentence is Reasonable</u>

This is a criminal wildlife trafficking case in which the defendant's conduct deliberately violated the regime designed to protect an ancient, iconic species from extermination. The defendant's criminal conduct was intentional, repetitive and took place over a period of almost a year. Criminal violations of wildlife statutes harm the public and our natural resources. They create demand, and a market for the exploitation of endangered species such as the black rhinoceros. In <u>Wang</u>, the sentencing court noted the importance of wildlife trafficking cases, calling the conduct in that case extremely troubling and remarking that there are few cases where general deterrence is as important.

Wildlife crimes, especially the crimes at issue in this case, are very difficult to detect. The defendant's offenses were only uncovered as a result of a long-term, pro-active investigation. Consequently, deterrence, both specific and general, is essential. This is especially true because the offenses were intentional, repetitive, and involved concealment. A Guidelines sentence is appropriate to promote respect for the law and assure that others engaged in similar offenses will be deterred.

The defendant, in his sentencing memorandum, suggests a sentence of time served but provides no argument to warrant a sentence below the Guidelines range of 24 to 30 months' incarceration. The letters attached to his sentencing memorandum fail to speak to any particular personal circumstance that would justify a sentence of time-served. In this case, there is no question that the defendant knew his conduct was illegal, as evidenced by his hiring a straw buyer to purchase the horns after the defendant and his co-conspirators were refused. Just as telling was the defendant's fabrication of the sales receipt, in an attempt to legitimize subsequent sales of the horns. The defendant knew he was engaged in risky conduct and understood the

potential consequences. He did not act on impulse or by mistake. The defendant thought through each action to maximize the financial advantage to himself and his co-conspirators.

Also worth noting is the fact that the defendant's criminal conduct did not involve a solitary violation or mistake that might be explained as a single instance of bad judgment. Rather, the conduct involved a fairly lengthy conspiracy to travel to and throughout the United States to engage in the trade of endangered species for profit. The defendant's crimes also involved significant planning, and international coordination. These are relevant factors that preclude an aberrant behavior departure pursuant to the sentencing guidelines. See U.S.S.G. § 5K2.20. The act of falsifying a document in an attempt to conceal the illegality of the initial purchase and to complete the subsequent sale also reveals the defendant's consciousness of guilt.

Furthermore, it is important to note that the volume of money passing through the defendant's Bank of America account, e.g. a deposit of $41,480 on October 7, 2010, withdrawals of $15,000 and more than $25,000 on October 8, 2010 and October 12, 2010, strongly suggests that he received, or anticipated, more significant income than reported to Probation. Moreover, the defendant's statements to law enforcement following his arrest, i.e., that he worked in landscaping while in the United States, cannot be reconciled with the amounts of money passing through his accounts.

The defendant has been detained since his arrest on September 14, 2013, a period of just over 3 months. The defendant now seeks a sentence of time served, which is well below the Guidelines range of 24 to 30 months' incarceration. In this case, a sentence of time served would be inconsistent with the seriousness of the crimes committed by this defendant and would result in a sentencing disparity with other similar cases in that the defendant's sentence would be disproportionately low. See, e.g., United States v. Qiang Wang, 13 Cr. 452 (KBF) (S.D.N.Y.

2013) (37 months for conspiracy to violate the smuggling statute and Lacey Act related to rhinoceros horn carvings with a market value in excess of $1 million); United States v. Vinh Chuing "Jimmy" Kha et al., No. 12-CR-00202 (C.D. Ca.) (42 and 46 month sentences for smuggling, Lacey Act, money laundering and tax fraud relating to rhinoceros horns with a market value in excess of $1 million, but not more than $2.5 million); United States v. Tamba Kaba, No. 1:09-CR-00858 (EDNY) (33 month sentence for smuggling ivory statues into the U.S.); United States v. De Molina, No.1:11-CR-20808 (S.D. Fla.) (20 month sentence for Lacey Act and smuggling violations involving smuggled protected animal parts for taxidermy pieces); United States v. Blyth, et al., No. 1:10-CR-00011 (S.D. Ala.) (33, 24, and 13 month sentences for Lacey Act and smuggling mislabeled seafood); United States v. Place, et al., Nos. 1:08-CR-10098 and 1:09-CR-10152 (D. Mass.) (33 and 9 month sentences for Lacey Act trafficking of sperm whale teeth and narwhal tusks); United States v. Joseph Russo, No. 12-CR-00980 (S.D.N.Y.) (co-owner of New York wholesale marine supplier sentenced to serve one year and one day of incarceration for smuggling live coral); United States v. Steven Patrick Garcia, Jr., No. 12-CR-00039 (D. Mont.) (24 month sentence for selling hawk and eagle feathers in violation of Lacey Act and the Migratory Bird Treaty Act); United States v. Hausman (12 Cr. 576 (JPO)) (6 months for Lacey Act interstate trafficking and obstruction; a variance from stipulated guidelines range of 18-24 months based on age and health).

The defendant seeks a sentence of time-served based primarily on an incorrect recital of recent wildlife trafficking prosecutions as somehow standing for the proposition that fair market value is determined by the illegal purchase of contraband at the wholesale level.[5] As discussed above, none of these claims merit a departure from the Guidelines range in this case.

---

[5] In promulgating a confused version of fair market value, the defendant fails to acknowledge that even if the Court were to substitute the wholesale price in this case ($50,000) for fair market value, his offense level (accounting for acceptance) is 12, with a corresponding range of 10 to 16 months' imprisonment.

E. <u>Forfeiture</u>

Lastly, forfeiture is appropriate in this case. Pursuant to Title 16, United States Code, Sections 1540(e)(4)(A) and 3374(a)(1), the defendant is liable to forfeit all wildlife imported by him in connection with the conspiracy to which he has pled guilty. <u>See</u> <u>United States v. Wahchumwah</u>, No. 09 Cr. 2035, 2011 WL 285161, at *2 (E.D. Wa. Jan. 25, 2011). As the wildlife at issue here, four rhinoceros horns, has since been illegally sold by the defendant, the government is entitled to a money judgment reflecting the amount the defendant profited from the sale, which in this case is $50,000. <u>See</u> <u>United States v. Awad</u>, 598 F.3d 76, 78 (2d Cir. 2010) (imposing forfeiture judgment against defendant, who was subject to mandatory forfeiture under statute regardless of whether he lacked assets to satisfy the forfeiture at sentencing). Indeed, the defendant consented to the entry of a forfeiture money judgment in an amount to be determined at sentencing under the terms of the plea agreement.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines range is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

                    Respectfully Submitted,

                    LORETTA E. LYNCH
                    United States Attorney

By:   /s/
        Julia Nestor
        Assistant U.S. Attorney
        (718) 254-6297

        Gary N. Donner
        Trial Attorney
        Environmental Crimes Section

cc:    Lawrence Hochheiser, Esq. (by Email and ECF)
       Clerk of the Court (JG) (by ECF)
       Roberta Houlton (By Email)